IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CORRINE CARTER,<br>    Plaintiff, | )<br>)<br>) |
| v. | )   CIVIL ACTION NO. 16-00574-N<br>) |
| A & E SUPPORTED LIVING, INC.,<br>    Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

This action is before the Court on the motion for summary judgment under Federal Rule of Civil Procedure 56 (Doc. 21) filed by Defendant A & E Supported Living, Inc. ("A & E"). Plaintiff Corrine Carter has timely filed a response (Doc. 23) in opposition to the motion, and A & E has timely filed a reply consisting of objections (Doc. 24) to certain of Carter's submissions in her response.[1] The motion is now under submission (*see* Doc. 22) and is ripe for disposition. Upon consideration, the Court finds that A & E's motion for summary judgment (Doc. 40) is due to be **DENIED**.

### I.    *Legal Standards*

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] With the consent of the parties, the Court has designated the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in this civil action, in accordance with 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and S.D. Ala. GenLR 73.   (*See* Docs. 11, 12).

matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (quotations omitted). "Summary judgment is only appropriate if a case is 'so one-sided that one party must prevail as a matter of law.' " *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (citation omitted). However, a " 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam). In other words, "there must be enough of a showing that the jury could reasonably find for that party … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration adopted) (quotations omitted)). *See also Allen*, 121 F.3d 642, 646 (11th Cir. 1997) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (quotations omitted)). "The Court 'must avoid weighing conflicting evidence or making credibility

determinations.' " *Ave. CLO Fund*, 723 F.3d at 1294 (quoting *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000)). However, " 'an inference based on speculation and conjecture is not reasonable.' " *Id.* (quoting *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

"Where, as here, the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.' " *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (en banc)). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). "For issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.' " *Hammer*, 20 F.3d at 1141 (quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Allen*, 121 F.3d at 646 (quotation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (quotation omitted). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

Importantly, " '[t]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.' " *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)). Relatedly, while "it may consider other materials in the record[,]" the "court **need** consider **only** the cited materials…" Fed. R. Civ. P. 56(c)(3) (emphasis added).

## II. *Factual Determinations*

A & E operates several group homes for intellectually disabled individuals. (Doc. 21-8 [Defendant's Ex. 7, Ezell Aff.] at 1, ¶ 3). This involves providing a home environment for them, and overseeing and assisting with their day-to-day schedule and certain aspects of their medical treatment, including distribution of medication. (*Id.*). Carter was hired by A & E as a certified nurse and began work on or about May 6, 2015. (*Id.*, ¶ 5; Doc. 21-3 [Defendant's Ex. 2, Carter Depo.] at 2, p. 28). Carter's duties included significant interaction with the group home residents, including assisting them with adult daily living such as bathing and dressing, helping them in and out of bathtubs, general hygiene management, behavior management, and general household duties. (Doc. 21-8 at 1 – 2, ¶ 5). Due to the nature of their disabilities, residents could become aggressive towards their caregivers. (Doc. 21-2 [Defendant's Ex. 1, Battiste Depo.] at 10).

Pamela Battiste is a registered nurse who works for A & E on a contract basis as a medication assistant supervisor. (*Id.* at 2). With Battiste's approval and certification, unlicensed nurses such as Carter could, after passing certain training, distribute medication to A & E residents. (*Id.* at 2 – 3). Battiste was the sole decision-maker on whether to allow A & E employees to dispense medication under her license. (*Id.* at 10 – 11).

Unbeknownst to A & E, Carter was several months pregnant when she started work there, though there is some dispute over whether Carter was aware of her pregnancy at the time. A & E first became aware of the pregnancy on June 4,

2015, when Battiste met with Carter at one of A & E's facilities to discuss setting up a time for medication distribution training. This was Battiste's first time meeting Carter. (*Id.* at 4 – 5). Carter requested that the training take place during working hours because she often had doctor appointments on her off days due to her high-risk pregnancy. (*Id.* at 5).[2] Carter also told Battiste that her doctor had wanted to admit her to a hospital due to high blood pressure at a recent appointment but didn't because Carter's children were with her. (*Id.* at 6).

According to Battiste, Carter "went ballistic" when Battiste gave her a date for training, acted "upset" about another employee, and complained that A & E "was so unprofessional." (*Id.* at 5 – 6). Battiste determined that she would not permit Carter to dispense medication under her supervision because, in her opinion, Carter's behavior at the June 4 meeting was "unprofessional." (*Id.* at 11).[3] Without Battiste's approval to dispense medication, Carter would be limited to working the "third shift," "ten to six." (*Id.* at 11 – 12).

On June 5, 2015, Carter was called into a meeting with two of A & E's owners, Andrella Andrews and Melissa Ezell. (Doc. 21-5 [Defendant's Ex. 4, Ezell Depo.] at 2 – 3). Battiste was also present. (*Id.*). Ezell informed Carter that A & E

---

[2] In her charge of discrimination submitted to the Equal Employment Opportunity Commission, which is dated July 17, 2015, and was signed by Carter under penalty of perjury in substantial compliance with 28 U.S.C. § 1746, Carter claims Battiste first raised the issue of pregnancy at the June 4 meeting by asking Carter if she was pregnant. (Doc. 23-1 at 6).

[3] Carter's response brief generally disputes that she acted "unprofessionally" at the meeting with Battiste, but she points to no deposition or affidavit testimony to contradict Battiste's statements that Battiste at least subjectively found Carter to have behaved "unprofessionally."

management was concerned about her high-risk pregnancy. (*Id.* at 4 – 5). Specifically, Ezell shared her concerns that Carter "was at risk to be hurt and [Ezell] didn't want that for her or her unborn child, for her baby; nor did [she] want to put the people that [A & E] serve at risk…" (*Id.* at 5). Ezell also informed Carter that Battiste had declined to certify her to dispense medication due to her purported "unprofessional behavior." (*Id.* at 5 – 6).

Ezell informed Carter that she would still be willing to let Carter work the third shift. (*Id.*). However, Ezell required Carter to first obtain a doctor's note saying that it was okay for her to perform her duties at A & E, before she would be placed back on shift. (*Id.* at 5). Ezell required that the note be very specific to indicate that the doctor knew what Carter's job entailed from a physical standpoint. (*Id.*). Carter subsequently gave A & E management a letter dated June 12, 2015, signed by a registered nurse rather than a doctor, stating that Carter "has not been placed on any work restrictions and is deemed medically able to maintain her current work schedule and job functions." (Doc. 21-6 [Defendant's Ex. 5]). The letter did not specifically indicate that the signatory knew what Carter's job entailed from a physical standpoint, as Ezell had requested. (*Id.*)

According to A & E, on June 16 or 17, 2015, Ezell and Andrews again met with Carter. (Doc. 21-7 [Defendant's Ex. 6, Andrews Depo.] at 7). They asked her to get a supplemental letter providing "additional input from the doctor on…whether or not he specifically was aware of the job duties [Carter] had to perform and the conditions under which she had to perform them[.]" (*Id.* at 8). However, they

informed her that she was eligible to work the third shift, as well as the first and second shifts on weekends where she could work alongside someone that Battiste would allow to dispense medication. (*Id.*). Carter was "instruct[ed] to get in touch with management about working one of those shifts that she was eligible for" but "never" did. (*Id. See also* Doc. 21-5 at 7 (Ezell testified that Carter was asked to let A & E "know when she wanted to be put back on the schedule" but "was never put back on the schedule…because she did not…say, okay, I'm ready to be put back on the schedule.")).

In her EEOC charge executed under penalty of perjury, Carter agrees that she "was not returned to the schedule" after she provided the note. (Doc. 23-1 at 6). However, Carter "denies that a second meeting took place." (Doc. 21-1 [Defendant's Opening Brief];[4] Doc. 23 at 2 [Plaintiff's Response Brief]).

### III. *Analysis*

"[E]mployment discrimination, including discrimination on the basis of sex," is prohibited by Title VII of the Civil Rights Act. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 276–77, 107 S. Ct. 683, 687, 93 L. Ed. 2d 613 (1987). In response to a Supreme Court holding that discrimination on the basis of pregnancy is not sex discrimination,

---

[4] The deposition pages cited by A & E to support this statement ("Carter Depo. p. 79-80") are not in the record. However, because Carter agrees in her response brief that she "never met with nor had any contact with the Defendant after" dropping off the letter (Doc. 23 at 2 – 3), the Court accepts for purposes of the present motion that Carter denies the second meeting took place.

However, to the extent Carter's brief otherwise claims she "never met with nor had any contact with the Defendant after" dropping off the letter, and as to her claim that she "tried to call the Defendant to be placed back on the schedule and be allowed to resume work" (Doc. 23 at 2 – 3), the Court disregards these representations in deciding the present motion. As A & E correctly points out in its objections to Carter's response (*see* Doc. 24 at 2), Carter cites no record evidence to support them. *See* Fed. R. Civ. P. 56(c)(1)(A).

> Congress amended Title VII to include the Pregnancy Discrimination Act (PDA). The PDA amended Title VII to add that discrimination "because of sex" or "on the basis of sex," includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

*Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017) (footnote omitted). *See also Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1254–55 (11th Cir. 2012) ("As amended by the Pregnancy Discrimination Act, Title VII prohibits employers from discriminating against employees because of pregnancy. 42 U.S.C. § 2000e–2(a)(1)–(2) (prohibiting discrimination 'because of ... sex'); *id.* § 2000e(k) ('The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy ....')."). Carter's complaint (Doc. 1 at 6 – 16) alleges a single cause of action against A & E under Title VII for discrimination on the basis of pregnancy or related medical conditions.

> The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits. *Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 989 (11th Cir. 1986).
>
> There are two types of discrimination actionable under Title VII. The first is "disparate treatment," or intentional discrimination. The Supreme Court has provided the following explanation of disparate treatment:
>
>> The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335-36 n. 15, 97 S. Ct. 1843, 1854-55 n. 15, 52 L. Ed. 2d 396, 415 n. 15 (1977) (citations omitted)…

The second type of discrimination prohibited by Title VII is "disparate impact." The Supreme Court explains disparate impact as follows:

> [Claims of disparate impact] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate impact theory.

*Int'l Brotherhood of Teamsters v. United States,* 431 U.S. at 335-36 n.15, 97 S. Ct. at 1854-55 n.15, 52 L. Ed. 2d at 415 n.15 (1977) (citations omitted). Although a plaintiff must establish intentional discrimination to prevail on a claim of disparate treatment, a claim of disparate impact may succeed without any evidence whatsoever of intentional discrimination.

*Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312–13 (11th Cir. 1994). Considering the allegations in Carter's complaint and the parties' briefing on the present motion, it is clear that Carter is not asserting a Title VII disparate impact claim. *Cf. Armstrong*, 33 F.3d at 1314 ("Since a plaintiff need not establish intentional discrimination, the analysis in cases alleging disparate impact involves different issues of fact and types of evidence than the analysis required in disparate treatment cases. Disparate impact cases typically focus on statistical disparities and on the various explanations for those disparities, rather than on specific incidents." (citation omitted)); *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345 (2015) ("[E]mployment discrimination law also creates what is called a 'disparate-impact' claim. In evaluating a disparate-impact claim, courts focus on the

*effects* of an employment practice, determining whether they are unlawful irrespective of motivation or intent.").[5]

"[A] plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas" Corp. v. Green,* 411 U.S. 792 (1973). *Young*, 135 S. Ct. at 1345 (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985)).

> Direct evidence is "evidence that, if believed, proves the existence of a fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (quotation marks omitted). "[O]nly the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (quotation marks omitted).
>
> In cases involving circumstantial evidence, [courts] apply the burden-shifting framework of *McDonnell Douglas*...The Supreme Court developed this framework because it recognized that "direct evidence of an employer's motivation will often be unavailable or difficult to acquire." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1537 (11th Cir. 1997) (quotation marks omitted). Thus, the burden-shifting scheme of *McDonnell Douglas* is a procedural device designed to help the parties progressively "sharpen the inquiry into the elusive factual question" of the employer's motivations. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 n.8, 101 S. Ct. 1089, 1095 n.8, 67 L. Ed. 2d 207 (1981).
>
> Under *McDonnell Douglas,* the plaintiff must initially establish a prima facie case, which generally consists of the following: 1) the plaintiff was a member of a protected class, 2) she was qualified to do the job, 3) she was subjected to an adverse employment action, and 4) similarly situated employees outside of the protected class were treated differently. *See Wilson,* 376 F.3d at 1087, 1091. The prima facie case serves the basic function of "eliminat[ing] the most common

---

[5] Nor does the record support a finding that Carter is asserting what the Supreme Court has "called a 'pattern-or-practice' claim." *Young*, 135 S. Ct. at 1345.

nondiscriminatory reasons for the plaintiff's rejection"—namely, that the employee was not qualified for the position. *Burdine,* 450 U.S. at 253–54, 101 S. Ct. at 1094. "The burden of establishing a prima facie case ... is not onerous." *Id.* at 253, 101 S. Ct. at 1094.

The prima facie case creates a presumption of discrimination, the role of which is to "forc[e] the defendant to come forward with some response." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993). Thus, once a plaintiff makes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Wilson,* 376 F.3d at 1087. "The employer need not persuade the [finder of fact] that it was actually motivated by the proffered reasons." *Id.* (quotation marks omitted). However, "the defendant must clearly set forth ... the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S. Ct. at 1094.

Once the employer identifies a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears, and the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256, 101 S. Ct. at 1095. The plaintiff "cannot recast the reason but must meet it head on and rebut it." *Wilson,* 376 F.3d at 1088. The plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's rationale. *Combs,* 106 F.3d at 1538 (quotation marks omitted). To do so, the plaintiff may rely on the evidence offered initially to establish the prima facie case. *Wilson,* 376 F.3d at 1088.

At this stage, the plaintiff's burden of rebutting the employer's proffered reasons "merges with the [plaintiff's] ultimate burden of persuading [the finder of fact] that she has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S. Ct. at 1095. Thus, "the question becomes whether the evidence," when viewed as a whole, "yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1326 (11th Cir. 2011). Put another way, the issue is whether there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Id.* at 1328 (quotation marks and footnote omitted).

*Holland v. Gee*, 677 F.3d 1047, 1055–56 (11th Cir. 2012).

A & E's opening brief assumes that Carter cannot present direct evidence of pregnancy discrimination and argues she cannot establish a *prima facie* case of discrimination under *McDonnell Douglas/Burdine*, because she cannot present evidence that she was either subject to an adverse employment action or treated differently than a similarly situated non-pregnant employee. As Carter correctly points out in her response, however, A & E itself provides direct evidence of pregnancy discrimination, admitting that A & E management removed Carter entirely from the work schedule[6] because of her pregnancy and/or the related "high risk" conditions.[7] That A & E may have done this out of benevolent concern for the health and safety of Carter and her unborn child does not excuse the discriminatory nature of its actions.[8] Thus, because Carter has cited direct evidence of pregnancy

---

[6] It is uncontroverted that Battiste was not going to permit Carter to dispense medications, thus drastically limiting what shifts she could work. Nevertheless, the evidence indicates that Carter still would have had the option to work the third shift even without being able to dispense medication.

[7] *See Torres-Skair v. Medco Health Sols., Inc.*, 595 F. App'x 847, 852–53 (11th Cir. 2014) (per curiam) (unpublished) ("In *Holland*[ *v. Gee*], this Court found direct evidence of discrimination where the decision maker explicitly testified that part of his reasoning for transferring the plaintiff was her pregnancy. 677 F.3d at 1058. Clearly, if believed, the testimony in *Holland* proved that the plaintiff's pregnancy was a motivating factor for the transfer decision."). *Cf. Crawford v. Dolgen Corp. Inc.*, 790 F. Supp. 2d 1361, 1367 (S.D. Ala. 2011) (DuBose, J.) (store manager's statements that "she didn't think it was going to work that Plaintiff was pregnant, that she couldn't have her go out on maternity leave, and that she was going to have to get rid of Plaintiff...constitute direct evidence that Plaintiff's termination was prompted by her pregnancy" (quotations omitted)).

[8] *See Hayes*, 726 F.2d at 1547–48 ("Initially, the Hospital argues that we should analyze this case under the pretext theory as set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)… The Hospital

discrimination, the Court need not determine whether she has presented sufficient circumstantial evidence under the *McDonnell Douglas/Burdine* test.[9]  *See Gate*

---

argues that its stated reason for firing Hayes-to protect her fetus from the harmful effects of radiation-is a sufficient nondiscriminatory reason to shift the burden back to Hayes to prove pretext. The Hospital then argues that Hayes failed to prove that its reasons for firing her were a pretext for discrimination. []Prior to passage of the Pregnancy Discrimination Act, the Hospital's *Burdine* argument might have had some merit, because pregnancy was considered a legitimate, nondiscriminatory basis for differential treatment. That is no longer the case, however, because the Pregnancy Discrimination Act mandates that a pregnancy-based rule can never be 'neutral.' In other words, firing Hayes because she was pregnant is just as facially discriminatory under the Pregnancy Discrimination Act as it would be to fire her solely because she was black under Title VII. Therefore, *Burdine* is inappropriate here, since the Hospital admits that Hayes was fired because of her pregnancy, rather than because of some other, potentially non-discriminatory reason…"). *Cf. Armstrong*, 33 F.3d at 1315–16 ("With the PDA, Congress made clear that the decision to become pregnant or to work while being either pregnant or capable of becoming pregnant was reserved for each individual woman to make for herself. The right to make this decision rests with the woman. She may choose to continue working, to seek a work situation with less stringent requirements, or to leave the workforce. In some cases, these alternatives may, indeed, present a difficult choice. But it is a choice that each woman must make…An employer is generally prohibited from deciding for a pregnant employee what course of action is best for her." (citation and quotation omitted).

[9] A & E has argued that Carter's removal from the work schedule does not arise to the level of an "adverse employment action." Though A & E makes this argument only in the context of arguing Carter cannot establish a *McDonnell Douglas prima facie* case, "[i]n a Title VII case, an adverse employment action is not only an element of the prima facie case, but also of the claim itself." *Holland*, 677 F.3d at 1056 (citations omitted).

> To prove an adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. The employment action must be materially adverse as viewed by a reasonable person in the circumstances…Title VII does not require proof of direct economic consequences in all cases. Thus, a transfer can be adverse if it involves a reduction in pay, prestige or responsibility.

*Id*. at 1057 (citations and quotations omitted). Certainly, being removed entirely from the work schedule reduced Carter's responsibility. Moreover, Carter's response brief asserts that A & E "did not continue to pay her when she was taken off the schedule." (Doc. 23 at 5). While Carter's brief cites no record evidence to directly support this

*Gourmet*, 683 F.3d at 1255 ("A plaintiff may use **either** direct **or** indirect evidence to show that her employer discriminated against her because of her pregnancy…Indirect evidence is circumstantial evidence." (emphasis added) (quotation omitted)).[10]

---

statement, it is a reasonable inference to draw from the record evidence. Moreover, while A & E objects to certain statements in Carter's brief as "purely a statement of Plaintiff's counsel…not supported by" evidence, A & E does not specifically object to the statement that A & E did not continue to pay Carter. Accordingly, the undersigned finds that the record supports a determination that Carter experienced an adverse employment action for purposes of Title VII.

While A & E claims that the removal was too temporary to constitute an adverse action because A & E management offered to return her to the work schedule at the second meeting, Carter disputes that the second meeting took place. Thus, there is a genuine issue of material fact as to the temporary nature of the removal.

[10] The Eleventh Circuit Court of Appeals has "identified two separate theories of disparate treatment." *Armstrong*, 33 F.3d at 1313 (citing *Maddox v. Grandview Care Center*, 780 F.2d 987, 990 (11th Cir. 1986)). The court of appeals explained these theories in *Maddox* as follows:

> In order to prevail on a claim of disparate treatment under Title VII…, a plaintiff must prove that her employer unlawfully discriminated against her because of her protected classification. There are several methods by which a plaintiff can achieve this. In *Hayes v. Shelby Memorial Hospital*, 726 F.2d 1543 (11th Cir. 1984), this court provided a concise framework for the pursuit of claims under the most prevalent theories. Under the "pretext theory," a plaintiff must establish a prima facie case, which gives rise to a rebuttable presumption of unlawful discrimination. Much has been written concerning what constitutes a prima facie case of discrimination under Title VII. The Supreme Court first drew a blueprint for establishing a prima facie case of disparate treatment in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed .2d 668 (1973), and further refined the procedures in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). A defendant can then rebut this presumption by articulating a "legitimate, nondiscriminatory reason" for its actions. In order for the plaintiff to prevail, she must persuade the factfinder that the proffered reason is a pretext for discrimination. Under the "facial discrimination"

## IV.   *Conclusion*

In accordance with the foregoing analysis, it is **ORDERED** that A & E's motion for summary judgment (Doc. 21) is **DENIED**.[11]

**DONE** and **ORDERED** this the 29th day of November 2017.

/s/ *Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

---

theory, the plaintiff establishes a presumption that the case is one of facial discrimination by showing that the "policy by its terms applies only to women or pregnant women." *Hayes,* 726 F.2d at 1548.   The employer can rebut this presumption by showing that in spite of its appearance of differential treatment, the policy is neutral in that it equally affects all employees or that it is a bona fide occupational qualification.

*Maddox*, 780 F.2d at 989–90 (footnote omitted).   It appears Carter's use of direct evidence of discrimination supports a "facial discrimination" theory.   *See Armstrong*, 33 F.3d at 1313 ("A plaintiff alleging a claim of disparate treatment must establish that the employer intended to discriminate against the protected group. **If direct evidence of discriminatory intent is not available**, a plaintiff may present **circumstantial evidence** from which an inference of intentional discrimination may be drawn…The first step in a claim of disparate treatment, **based on a theory of 'pretext' and supported by circumstantial evidence**, is for the plaintiff to establish a prima facie case which creates a rebuttable presumption of unlawful discrimination." (emphasis added)).   However, A & E has not addressed this distinction at all in its summary judgment briefing, much less the heavy burden of rebutting a presumption of "facial discrimination."   *See Hayes*, 726 F.2d at 1549 ("We hold that when a policy designed to protect employee offspring from workplace hazards proves facially discriminatory, there is, in effect, no defense, unless the employer shows a direct relationship between the policy and the actual ability of a pregnant or fertile female to perform her job.").

[11] Any of A&E's objections (Doc. 24) not expressly addressed herein are **MOOT**, as the Court finds it unnecessary to consider those objected-to submissions in deciding the present motion.